UNITED STATES of America

v.

**William J. KILROY.**

**Crim. Case No. 90–101.**

United States District Court,
District of Columbia.

July 19, 1991.

Harry Benner, Asst. U.S. Atty., Crim. Div., Washington, D.C., for U.S.

Alan G. Warner, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

On March 9, 1990, a federal grand jury in Washington, D.C., returned the instant 13-count indictment against defendant William J. Kilroy, an insurance broker, charging him with multiple offenses in connection with his alleged embezzlement of approximately $573,000 from two ERISA pension plans of which he was the administrator from mid-1981 to mid-1985.[1] According to the indictment, Kilroy failed to remit, and converted to his use, the monies he was to have sent to the Hartford Insurance Company ("Hartford") to pay the premiums for the annuities that funded the plans for the benefit of staff and contract employees of the National Council of Senior Citizens ("NCSC") in the District of Columbia.

Kilroy has filed three motions in advance of trial, any one of which, if granted, would result in or necessitate a dismissal of the indictment.

### I.

During roughly the same period covered by this indictment, i.e., the early 1980's, Kilroy was under investigation by an organized crime strike force of the U.S. Department of Justice in Las Vegas, Nevada (the "Las Vegas Strike Force"), in connection with labor union corruption in general, and, specifically, Kilroy's suspected sale of fraudulent insurance coverage to a culinary workers' union local welfare and pension fund. In late March, 1985, Kilroy, among others, was indicted in Las Vegas, and he immediately opened negotiations with the Strike Force prosecutors to become a cooperating witness. The negotiations between Kilroy's attorneys and the prosecutors culminated in a written plea agreement under date of August 14, 1985, by which Kilroy undertook to plead guilty to a single felony count of the Las Vegas indictment and to provide "full and truthful information and testimony whenever called upon" in return for immunity—in part "transactional," and in part "use" immunity—for all he re-vealed. (Gov't Exhibit No. 1). Kilroy did as he had agreed, testified for the government against others indicted in Las Vegas, and ultimately received a sentence of probation on his felony conviction.

### II.

Kilroy moves to dismiss the District of Columbia indictment for an alleged violation of his Fifth Amendment right to due process in the form of the government's unconscionable delay in presenting its evidence to a grand jury after first acquiring knowledge of his crime against NCSC. He had, in fact, confessed to it to the F.B.I. in August of 1985, following his plea agreement in Law Vegas. The District of Columbia grand jury did not indict until March of 1990.

Since *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), it has been established, however, that the Sixth Amendment right to a "speedy trial" does not begin to run for a criminal suspect not in custody until indictment, and that an otherwise dilatory prosecution does not compromise a defendant's Fifth Amendment due process rights, and may go forward, if commenced within the period of limitations, unless the defendant has suffered actual prejudice to his ability to obtain a fair trial by the elapse of time, and the delay was intentionally caused by the government to gain a tactical advantage over him. 404 U.S. at 324, 92 S.Ct. at 465. In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) it is made clear that the burden is upon the defendant to establish both the prejudice to his defense and the government's malign intent.

Kilroy attempts to show prejudice to his defense here by noting that two people involved in the events in Las Vegas and Washington have died in the interval between his confession in August, 1985, and his indictment in March of 1990. James Y. Kimm, an official of the NCSC who initiated the audit of Kilroy's accounts, died in 1988. Dennis Cook, a U.S. Department of

---

1. The March 9th indictment superseded one of a week earlier, and added three counts charging Kilroy with submissions of false reports to the Internal Revenue Service respecting the plans.

Labor investigator attached to the Las Vegas Strike Force, died the preceding year. Kilroy does not contend that either man could have offered exculpatory evidence. What he does contend is that their deaths prevent his showing that what they may have learned, directly or indirectly, from his immunized confession of criminal activity may have tainted the rest of the government's evidence against him.

The record before the Court conclusively establishes, however, that Kimm ordered the audit in April, 1985, several months before Kilroy's August, 1985, confession, at a time when his peculations from NCSC were presumably unknown to anyone.[2] And Cook is not shown to have communicated with anyone connected with the NCSC investigation and prosecution respecting the allegations against Kilroy in his handling of the NCSC funds. Thus, the proposition that Kilroy's defense has been disadvantaged in any particular by the deaths of Kimm and Cook is, at the moment, a purely speculative possibility, and certainly not the substantial actual prejudice required by *Marion* and *Lovasco* as sufficient reason to abate a delayed prosecution altogether.

Moreover, the evidence fails to support a finding of an evil motive on the part of the government in delaying the return of an indictment in the District of Columbia until March of 1990. The explanation given by the government (which is both innocent and unrefuted) is that it wished to complete the several trials arising out of the Las Vegas investigation in which Kilroy was a cooperating witness before complicating those prosecutions, and Kilroy's life, by bringing additional charges against him. The last of those trials took place in 1988. Thereafter, the prosecutors asked the Internal Revenue Service to review their NCSC evidence to determine if tax offenses, as well as theft, had been committed by Kilroy, and then presented the entire case to the Department of Justice to seek authorization to prosecute. The Department of Justice

completed its review in early 1990, and the case was presented to a grand jury for indictment a month or two later. The investigative process leading up to indictment may have been desultory, and the government not altogether candid with Kilroy about it, but he has not shown it to have been done as slowly as it was for any purpose of getting an upper hand in this case.

### III.

■ Kilroy also moves to dismiss the indictment on the ground that it represents a breach of the plea agreement he reached with the Las Vegas Strike Force.

The text of Kilroy's agreement with the Las Vegas prosecutors was the product of an exchange of correspondence between the Strike Force attorneys and counsel for Kilroy in Aberdeen, Maryland, which began with a prosecution offer dated July 18, 1985, prompting a counteroffer from the defense of July 26, 1985. The pertinent portion of the August 14th agreement, paragraph 3, is taken *verbatim* from the counteroffer.[3] Paragraph 3 reads:

The Government will dismiss the other counts of the [Las Vegas indictment] ... and will not prosecute Mr. Kilroy for his conduct in connection with any dealings or activities in which he was involved with Louis Ostrer from January 1, 1980 to the present, which Mr. Kilory [sic] has disclosed to the Government. The Government will also give Mr. Kilroy use immunity for all other information provided prior to his appearance before a grand jury. As used herein, the term "Government" includes all agencies of the United States Federal Government in all jurisdictions. (Gov't Exhibit No. 1).

Kilroy was a protegé of one Louis Ostrer, a debarred New York insurance broker and convicted felon, in whose office Kilroy began his insurance career in 1959 at the age of 18. After Ostrer lost his own license he did business through Kilroy who

---

**2.** The record was developed during a three-day *Kastigar* hearing in December, 1990. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**3.** Thus, to the extend of any ambiguity, it must be construed against the defendant.

would write the coverage and split the commissions with Ostrer. Ostrer, who dealt with "the people who controlled the unions," according to Kilroy (Tr. 223), continued to refer business to Kilroy even after Kilroy left his employ and moved from New York to Maryland to open his own office in 1976.

It was through his acquaintance with Ostrer, albeit as a result of antipathy between Ostrer and a culinary workers' union official, that Kilroy became involved in the Las Vegas venture, in which Kilroy ostensibly procured fiduciary liability "insurance coverage" for the union from a bogus carrier, splitting the commissions with Ostrer.[4] Kilroy was indicted in Las Vegas in March, 1985, and surrendered to the Baltimore F.B.I. field office immediately. Shortly thereafter his attorneys began negotiations for his cooperation.

It is Kilroy's contention that the plea agreement has conferred upon him transactional immunity with respect to the pending District of Columbia charges, because they arise out of his "conduct in connection with any dealings or activities in which he was involved with Louis Ostrer" subsequent to January 1, 1980. Aside, however, from a tenuous chain of introductions, which Kilroy speculates as implying Ostrer must have had something to do with it, there is simply no evidence that Ostrer was in any way "involved" in "dealings" or "activities" with NCSC, with or without Kilroy.

According to Kilroy, he was introduced to one Michael Capurso, a New York insurance broker well-connected with labor unions, as a prospective ERISA plan administrator who "could be trusted." (Tr. 230). Seymour Greenfield, a long-time business associate of Ostrer's, made the introduction, and, because Kilroy believes that Greenfield does nothing except upon instruction from Ostrer, Kilroy assumes Ostrer set the chain in motion.

In due time Capurso put Kilroy in touch with the general counsel of NCSC in Wash-

ington as a prospective administrator of NCSC's ERISA plans. Kilroy ultimately paid bribes to both Capurso and the general counsel for inside information enabling Kilroy to submit the low bid for his services and be selected as the plans' administrator. (Tr. 227–230).

Ostrer denies any knowledge of Kilroy's relationship with NCSC, and had nothing to do with his appointment as the plans' administrator. He was, in fact, in federal prison from February, 1981, to February, 1989. He took nothing from Kilroy's activities, either as a share of Kilroy's commissions or the monies he stole from it, a fact Kilroy acknowledges as true. (Tr. 54–56; 241). By contrast, when Kilroy and Ostrer worked an account together, they profited by splitting exorbitant commissions, not by theft. (Tr. 236).

At best, for Kilroy's purposes, the evidence shows that the corrupt are likely to be acquainted with one another as "people who can be trusted." It does not establish that they are "involved" in one another's corrupt activities, and the transactional immunity conferred upon Kilroy upon his plea agreement does not extend to what now appears to be his solitary theft of funds from a client he procured by yet another act of corruption.

## IV.

Finally, Kilroy moves to quash the indictment or suppress substantially all of the evidence against him on the ground that it derived, directly or indirectly, from the information he imparted to the F.B.I. under the government's promise of use immunity pursuant to the plea agreement.

At or about the same time the Las Vegas prosecution was getting underway in 1985, NCSC's comptroller—so far as appears oblivious at the time of Kilroy's Las Vegas activities—ordered an audit of Kilroy's handling of NCSC's pension plan accounts by a private CPA. NCSC's auditor began with an "entrance interview" with Kilroy on

---

**4.** The premise of the Las Vegas investigation was that the culinary workers' union had been infiltrated by organized crime and that Ostrer conspired with the organized crime figures who controlled it, paying "kickbacks" from the premiums paid for the illusory insurance placed by Kilroy.

May 29, 1985, who explained to the auditor that NCSC's premium payments were made payable to his company, Nationwide Family Plans, Inc., and that he would then remit the annuity premiums due to Hartford by checks drawn on his own company accounts. Kilroy did not reveal the shortages in the payments he had made to Hartford at the entrance interview, but within approximately a week thereafter the auditor became aware that Hartford had received considerably less than Kilroy was supposed to have remitted, and he reported the fact to NCSC.

In early July, 1985, without actually admitting his embezzlements, Kilroy referred the auditor to his Maryland attorneys then involved with the Las Vegas plea negotiations, who, when informed by the auditor of his findings and estimate of the amount of the shortage, obliquely confirmed the amount. By late September, 1985, the auditor was sufficiently certain of his figures to cause NCSC to report the shortage to the U.S. Department of Labor ("DOL") which opened a civil investigation of the matter on October 1st.[5]

Although the evidence does not show precisely when Kilroy first disclosed his thefts from NCSC to his Maryland attorneys, it is clear that they were aware of it by the time Kilroy's plea agreement had been reached. Kilroy had, in fact, already revealed it in the course of his debriefings by the F.B.I.[6]

On October 17, 1985, DOL's civil investigator met with NCSC's auditor, assistant comptroller, and general counsel, following, which, believing he had sufficient information to suspect criminal wrongdoing by Kilroy, he reported his suspicions to Assistant U.S. Attorney ("AUSA") Harry R. Benner of the U.S. Attorney's Office in Washington, D.C. The civil investigator was by then aware Kilroy had been indicted in Las Vegas, and told AUSA Benner about it.

Benner promptly called the Las Vegas Strike Force, confirmed Kilroy's status there, and learned that Kilroy was a "cooperating witness" with whom a plea agreement had been made calling for "some sort of immunity" for him. Shortly thereafter Benner learned that the Las Vegas Strike Force had been informed of "the NCSC situation," but was told "nothing substantive." From that point forward Benner cautioned everyone involved in the DOL's investigation of the need for an "independent source" of evidence against Kilroy should they decide to prosecute him for his embezzlement from NCSC, and to avoid any "taint" resulting from exposure to information derived in any fashion from Kilroy's debriefings or immunized testimony.

The District of Columbia indictment returned in March, 1990, was supported entirely by the testimony of a single witness before the grand jury, DOL's criminal investigator, who commenced his inquiries in December, 1986. At no time was the criminal investigator privy to information developed by the government from Kilroy himself, and thus he imparted none to the grand jury in his four appearances before it.[7]

The leading case in this jurisdiction as to the dimensions of the *Kastigar* protection afforded an immunized accused against consequences of his own inculpatory statements is *United States v. North*, 910 F.2d 843, *reh'g. granted in part and denied in part*, 920 F.2d 940 (D.C.Cir.1990), *cert. de-*

---

5. DOL did not convert the investigation to "criminal" status until December, 1986.

6. First written mention of it is found in government documents in an F.B.I. telex of July 30, 1985, scheduling a "further debriefing" of Kilroy by a special agent from Las Vegas in pursuit of a report of the premium discrepancy from Hartford. (Gov't Exhibit No. 5).

On August 2nd Kilroy apparently told the special agent all about it when interviewed at Aberdeen, Md. (Gov't Exhibit No. 7), nearly two weeks prior to the plea agreement.

7. The DOL criminal investigator appeared before two grand juries on March 31, 1987, and on February 23, March 2 and March 9, 1990. (Gov't Exhibits Nos. 11–14). The transcripts reveal that the information he testified to came from NCSC; NCSC's private auditor; Hartford; bank records for business and personal accounts controlled by Kilroy subpoenaed by the grand jury; and the Internal Revenue Service. None appears to have derived from Kilroy's statements or testimony pursuant to his Las Vegas plea agreement.

*nied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Given its most expansive interpretation, *North* imposes upon the government the burden of proving that the evidence it proposes to use against an accused is neither derived from, nor motivated, affected or influenced, or shaped in any way, directly or indirectly, by the information imparted by the accused once having been promised immunity for having imparted it. The character of the government's case must, in other words, be as pristine as if the accused had never broken silence about the crime for which he is being prosecuted. *See also Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79, 84 S.Ct. 1594, 1609–10, 12 L.Ed.2d 678 (1964). It is clearly a heavy burden that *Kastigar,* as interpreted by *North,* places upon the government.

In this case, the Court finds that the government has, at least preliminarily, demonstrated the virtue of the case it proposes to offer against Kilroy. It appears to have available to it both testimonial and documentary evidence sufficient to prove a *prima facie* case against Kilroy which would have (and did) come to light had Kilroy never spoken on the subject of his dealings with the NCSC funds.

It is undoubtedly true that the prosecutor currently assigned to the case, and one or more possible prosecution witnesses, know of the fact—and only the fact—that Kilroy is purported to have confessed to his embezzlement. The government represents that responsibility for prosecution will be handed over to another Assistant United States Attorney who will be screened from even that knowledge, as well as the substance of any information Kilroy may have imparted. The case can, it appears, be proved without resort to witnesses who have knowledge of the issues raised by these pre-trial proceedings probing the extent to which the government case may have been tainted by immunized information given by Kilroy himself. It is, thus, premature to conclude that there is insufficient evidence to convict presently in the possession of the government which has not been acquired or af-

fected in any way by Kilroy's own revelations.

Therefore, it is, this 19th day of July, 1991,

ORDERED, that defendant's motions to dismiss the indictment are denied; and it is

FURTHER ORDERED, that the defendant's motion to suppress evidence is denied without prejudice; and it is

FURTHER ORDERED, that this case is scheduled for a status conference at 9:30 a.m. on July 29, 1991, to set a date for trial.