**UNITED STATES of America**

v.

**William J. KILROY, Appellant.**

**No. 92–3201.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1994.

Decided July 8, 1994.

Rehearing Denied Sept. 16, 1994.

Alan G. Warner, Washington, DC (appointed by the Court) argued the cause and filed the briefs, for appellant.

James C. Bohling, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the briefs were Eric H. Holder, Jr., U.S. Atty., John R. Fisher, Thomas J. Tourish, Jr., and Harry R. Benner, Asst. U.S. Attys., Washington, DC.

Before SILBERMAN, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge SILBERMAN.

SENTELLE, Circuit Judge:

William J. Kilroy appeals from a criminal judgment entered upon his conditional plea of guilty in which he preserved, *inter alia,* the issue of whether the indictment against him had been obtained in violation of immunity promised him in a plea agreement in a prior case. He raises only that issue on appeal. As we agree with the district court that the government has met its burden of establishing that its prosecution was untainted by improper use of immunized statements, we affirm.

## I. THE FACTS

Between 1981 and 1985, an organized crime task force of the Department of Justice investigated Kilroy, an insurance broker, on suspicion that he (and others) had sold fraudulent insurance coverage to a union pension fund in Las Vegas. In June, August and November of 1983, FBI agents and investigators from the Department of Labor interviewed Kilroy, who proved cooperative by disclosing relevant facts and documents. On March 26, 1985, a Las Vegas grand jury that had heard a synopsis of Kilroy's 1983 statements returned an indictment against him and others charging offenses arising out of the sale of fiduciary liability insurance to a culinary union through a sham company.

Kilroy then acquiesced to further interrogation by FBI agents; on August 1 and 2, 1985, Kilroy informed them that he had embezzled pension funds held in trust for the National Council of Senior Citizens (NCSC), a nonprofit corporation located in the District

of Columbia. On August 14, Kilroy agreed to plead guilty to one count of the Las Vegas indictment and to testify in related prosecutions; in return, the government, among other things, purported to grant him "retroactive use immunity" for his prior statements to the FBI, including his confession of the NCSC embezzlement and his disclosures in 1983.

In late March 1985, a short article in the interior pages of the *Baltimore Sun* reported that Kilroy had been indicted and described the charges. Several weeks later—before Kilroy confessed his embezzlement at NCSC—James Kim, NCSC's controller, asked accountant Robert Williams to audit NCSC's pension plan. On June 7, Williams reported to NCSC that he had reason to believe Kilroy had embezzled from the pension fund; by late September Williams had determined that the missing amount was $573,000 and advised NCSC that it must report the events to the federal Department of Labor. Throughout this time Williams was ignorant of Kilroy's confession in Las Vegas.

On October 1, the Department of Labor opened a civil investigation of the NCSC affair. The Department's investigator, James Pitt, met with NCSC staff and, in late October, reported his findings to Assistant United States Attorney Harry Benner of the U.S. Attorney's office in the District of Columbia. Benner telephoned Stanley Parry, a special prosecutor with the Las Vegas team, who sent Benner a copy of Kilroy's Las Vegas plea agreement. Parry also told Benner that Kilroy had confessed to the NCSC embezzlement, but provided no further details. At the end of October, Benner met with Pitt, informed him of the plea agreement, and warned him to base his investigation on sources independent of the Las Vegas investigations.

Sometime in 1986, however, Pitt contacted FBI Agent Mark Kaspar, in charge of the Las Vegas investigations, and one of two agents to whom Kilroy had confessed his embezzlement. Kaspar refused to provide Pitt with records concerning Kilroy, but told Pitt of Kilroy's admission; Kaspar added the warning that the admission fell within the government's grant of immunity. By late 1987, Pitt had finished his civil investigation and compiled a report that recommended legal action against Kilroy. In February 1988, Pitt obtained records of Kilroy's immunized statements from the Baltimore FBI office; apparently Pitt kept these documents separately from the civil investigatory file he had previously developed.

In December 1986, the Department of Labor opened a criminal investigation of the NCSC affair under the supervision of Robert Wagner. At the outset Benner told Wagner not to seek information from the FBI offices in Las Vegas or Baltimore and told him to warn those he interviewed not to reveal to him knowledge derived from immunized testimony. Wagner interviewed NCSC staff and, at the end of 1986, reviewed the civil files then compiled by Pitt. Informed by financial and tax records obtained from these sources, Wagner testified about Kilroy's embezzlement before a grand jury in Washington, D.C., on March 31, 1987 and on February 23, March 2, and March 9, 1990. Wagner was the only witness to testify and did not relate any of Kilroy's immunized statements. *See United States v. Kilroy,* 769 F.Supp. 6, 10 & n. 7 (D.D.C.1991) (describing sources and content of Wagner's testimony).

On March 26, 1990, the District of Columbia grand jury returned the indictment presently under review. Kilroy moved to dismiss the indictment on several grounds. Pertinent to the present appeal, he sought either to quash the indictment or suppress substantially all of the evidence against him on grounds that it was derived either directly or indirectly from information he had imparted under the government's promise of use immunity, in violation of the rule of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Benner and Wagner read all of Kilroy's immunized statements in the FBI files in Las Vegas and Baltimore.[1] Judge Jackson rejected all of Kilroy's mo-

---

**1.** After the district court rendered the ruling at issue Benner arranged for a new prosecutor to take the case to trial; the new prosecutor would receive packets of information containing only information derived from independent sources.

tions in a published opinion. *See Kilroy,* 769 F.Supp. at 6. With reference to the *Kastigar* ground preserved for appeal, that is Kilroy's claim that the indictment was obtained using "tainted" evidence .in violation of the immunity agreement, the district judge found that the indictment was entirely based on the testimony of Wagner, who appeared before the grand jury multiple times. The court further found that Wagner was at no time prior to his testimony privy to information developed in breach of the immunity agreement and thus could have imparted none to the grand jury.

## II. THE LEGAL FRAMEWORK

■ Kilroy's argument rests on the principle, fundamental to our constitutional government, that a citizen is free "from governmental compulsion to testify against himself." *United States v. North,* 910 F.2d 843, 853, *reh'g granted in part,* 920 F.2d 940 (D.C.Cir. 1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Fundamental as the prohibition against the prosecution's use of compelled testimony is, it is not absolute. Under 18 U.S.C. § 6002, the court may, upon the motion of the prosecution, compel a witness to testify even as to matters that incriminate him. However, the constitutionality of this compulsion depends upon the prohibition contained in the statute that "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." 18 U.S.C. § 6002. *See Kastigar v. United States,* 406 U.S. 441, 458, 92 S.Ct. 1653, 1663–64, 32 L.Ed.2d 212 (1971) (upholding the constitutionality of 18 U.S.C. § 6002 because the statutory "immunity from use and derivative use is coextensive with the scope of the [Fifth Amendment] privilege").

■ The *Kastigar* decision is the seminal case in use immunity jurisprudence. *Kastigar,* as applied in this Circuit in *North,* provides the framework for analysis applicable to prosecutions of previously immunized witnesses: for a prosecution to proceed over the objection of an immunized witness, the court must hold a hearing in which the "heavy burden" is on the government to demonstrate "that it obtained all of the evidence it proposes to use [or has used] from sources independent of the compelled testimony." *North,* 910 F.2d at 854. The parties and the district court assumed that the *Kastigar* framework applied in this case. As this case involved an attempt to retroactively immunize statements, we question that proposition.

■ The purpose of the *Kastigar* hearing is to determine whether or not coerced testimony has been used against the witness in violation of his Fifth Amendment rights. *See generally North,* 910 F.2d at 853–73. A plea agreement that purports to immunize testimony already given can hardly have compelled that testimony, and the *Kastigar* framework seems ill-suited to analyze an allegation of the violation of such an immunity agreement. Neither this Circuit nor any other has ever analyzed this novel concept of "retroactive use immunity." Only two district court opinions from a single district have alluded to "retroactive immunity." Moreover, neither of them, even if authoritative, lends any support to a generalized acceptance of such a concept, or provides any framework for analysis. *See United States v. Castellano,* 610 F.Supp. 1137, 1140 (S.D.N.Y. 1985) (noting without comment that an immunity order "was amended to grant ... retroactive immunity to [a prior] appearance," by a witness other than the defendant in the case); *United States v. Pellon,* 475 F.Supp. 467, 480 (S.D.N.Y.1979) (noting that an agreement between the government and the defendant did *not* provide "retroactive use and derivative use immunity," without discussing whether and under what framework of legal analysis any such immunity can exist).

Troubled that the parties might be attempting to impose upon the court an improper frame of legal reference, we considered the possibility that proper examination might be under the rubric of *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), which provides the authority for determining whether or not the government has breached a plea agreement

and, if so, what the proper remedy is. Therefore, we directed supplemental briefing by the parties. We specifically requested the parties to address the following question:

When the United States and a criminal defendant have entered into a plea bargain purporting to afford use immunity to statements made before the agreement, and made in the absence of immunity agreement or other coercion, and a "use" has allegedly been made of the statement between the time of its then voluntary making and the entry of the agreement, is the allegation of improper use properly adjudicated under the standards set forth in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), as a substitute compliance with the Fifth Amendment, or under the standards set forth in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), as a remedy for breach of plea agreement?

In addition, we asked the parties to address "whether the plea agreement is a stipulation of fictitious facts, and, if so, can the Court bind itself by that stipulation in light of *United States National Bank of Oregon v. Independent Insurance Agents of America*, — U.S. —, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)?" Inexplicably, the United States in its supplemental brief not only did not address the questions we submitted, but denied that the immunity agreement was retroactive at all, a position in direct contradiction to the entire prior history of the case, including not only the assumptions but the direct statements of the government's principal brief. *See, e.g.,* Brief of the United States at 2 ("Kilroy had *retroactively* received informal immunity for these statements pursuant to a plea agreement with the Las Vegas Strike Force.") (emphasis added).

The United States chose instead to address the question of whether an "informal" immunity agreement is governed by the *Kastigar* standard as if it were a formal order of immunity under 18 U.S.C. § 6002. While that is a pertinent question, it is one adequately addressed by the United States in its principal brief, unlike the retroactivity question to which the court had directed response. Fortunately, the supplemental brief of the defendant/appellant and our independent research have been more helpful. It now appears that the initially applicable standard is stated in *Santobello*, but as to the ultimate result it will not make any difference.

In *Santobello*, a defendant alleged that the state had violated its plea agreement by arguing in favor of a maximum sentence after having agreed that no sentence recommendation would be made by the prosecutor. Upon a showing that the promise had been made and broken, the Supreme Court vacated the judgment and remanded, holding that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello*, 404 U.S. at 262, 92 S.Ct. at 498–99.

In reviewing defense claims that a plea agreement has been made and broken, we have observed that "a plea agreement is a form of contract." *United States v. Pollard*, 959 F.2d 1011, 1022 (D.C.Cir.1992). Thus, if we are analyzing Kilroy's claims under *Santobello* rather than *Kastigar*, instead of the government having the burden of proving that its case was untainted by improper use of compelled statements, the defendant would have the burden of proving that the plea bargain was made and breached. Appellant has admitted this burden, and we agree that it is the appropriate one.

As to the making of the bargain, appellant has no problem. Not only does the government concede it, but the evidence is of a piece that the bargain was entered. As to the breach, appellant faces a rather higher obstacle—in the end, an insurmountable one. The plea agreement did not provide Kilroy with any transactional immunity—that is, a promise that the government would not prosecute the instant offense.[2] *See United States*

---

2. The bargain did in fact afford Kilroy transactional immunity as to some offenses. Specifically, the agreement provided that the government would "not prosecute Mr. Kilroy for his conduct in connection with any dealings or activities in which he was involved with Louis Ostrer...." Kilroy has abandoned on appeal a claim raised below and preserved in his conditional plea in

*v. Poindexter,* 859 F.2d 216, 219 (D.C.Cir. 1988). Rather, the government only promised to give Kilroy "use immunity for all other information provided prior to his appearance before a grand jury." The questions before first the district court and now this court are: (1) What did the agreement mean by "use immunity"? and (2) Did the government violate the protection afforded by that "use immunity"?

 As to the first question, as the Ninth Circuit noted in *United States v. Plummer,* 941 F.2d 799, 804 (9th Cir.1991), the phrase "use immunity" is subject to at least two interpretations. "Use immunity" can mean that the communicant is protected against only direct use of his communication; or, it can mean that he is protected against even "indirect" use under a concept generally called "derivative use immunity." Statutory immunity under § 6002 includes derivative use. "No testimony or other information compelled under the [immunity] order (or any information *directly or indirectly derived* from such testimony or other information) may be used against the witness...." 18 U.S.C. § 6002 (emphasis added). The Supreme Court in *Kastigar* held that the statute meant precisely what it said, and that, therefore, unlike some earlier immunity statutes, it is constitutional precisely because the immunity it provides "from use and derivative use is coextensive" with the Fifth Amendment privilege against self-incrimination. 406 U.S. at 453, 92 S.Ct. at 1661.[3]

The fact that the statute affords derivative use immunity does not, however, compel a conclusion that the plea agreement afforded more than a direct use immunity. As the Ninth Circuit observed in *Plummer,* "the Supreme Court's thorough discussion of use immunity in *Kastigar* carefully distinguishes between use immunity and the broader derivative use immunity," claimed by the defendant in *Plummer* and by Kilroy in this case. The district judge in *Plummer,* unlike the judge in the instant case, had held that the

omission of the word "derivative" in the agreement unambiguously bespoke the narrower immunity against the direct use of the declarant's statements. However, the Ninth Circuit observed that in the years since *Kastigar,* a "common understanding" of the term "use immunity" has arisen "in the criminal justice world" expanding the term to encompass derivative use immunity. 941 F.2d at 804. We agree. In the world since *Kastigar,* including our decision in *North,* the term "use immunity" has commonly been used to encompass the broader concept. For example, we stated in *North "use immunity* conferred under the statute is 'coextensive with the scope of the privilege against self incrimination....'" 910 F.2d at 854 (emphasis added), without specifying that we intended "derivative use immunity." Consistent with that same understanding, we agree with the Ninth Circuit that nothing else appearing, an informal use immunity afforded by agreement, *e.g.,* a plea bargain, includes derivative use immunity equivalent to that afforded by the statute.

That said, we can discern no other standard by which we would judge whether or not a breach had occurred than the application of the *Kastigar* rule as explicated in *North.* Accordingly, even though the defendant has the theoretical burden of establishing breach, we will examine the evidence as if the government had the burden, because it has in effect entered a promise that said, "we will not use any evidence against you that we could not have used if the *Kastigar* test applied." As *Kastigar* requires that the government will not use any evidence as to which it cannot meet the burden of proving that it was obtained independent of the defendant's self-incriminating statements, a *Santobello* agreement purporting to grant use immunity effectively places a *Kastigar* burden on the government when that agreement has allegedly been breached. Therefore, to apply *Santobello* to the peculiar facts of this case, we must determine how *Kasti-*

this case that the embezzlement from NCSC came within that prohibition.

**3.** *Cf. Ullmann v. United States,* 350 U.S. 422, 437, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956) (striking down as unconstitutional an immunity statute

because it "merely forbade the use of testimony given and failed to protect a witness from future prosecution based on knowledge and sources of information obtained from the compelled testimony").

*gar* would apply to the same alleged use of evidence.

### III. APPLICATION

█ The task of the court under *Kastigar*, as applied in *North*, is often more easily stated than accomplished. The controlling question is: Has the government met its "heavy burden" of demonstrating " 'that it obtained all the evidence it proposes to use [or has used] from sources independent of the compelled testimony.' " *North*, 910 F.2d at 854 (quoting *Kastigar*, 406 U.S. at 461–62, 92 S.Ct. at 1665–66). The district court was required to hold "a '*Kastigar* hearing' for the purpose of allowing the government to demonstrate" that it had met that burden. *North*, 910 F.2d at 854 (internal parentheticals omitted). That demonstration is necessary both as to the evidence used before the grand jury to obtain the indictment, and the evidence that the government has used or intends to use at trial to obtain a conviction, depending upon whether the *Kastigar* hearing is held before or after the trial. *See id.* at 868–73.

█ Here the district judge held such a hearing. He made the appropriate finding as to the grand jury evidence that the "indictment ... was supported entirely by the testimony of a single witness before the grand jury," and that that witness "at no time was ... privy to information developed by the government from Kilroy himself." *United States v. Kilroy*, 769 F.Supp. at 10. The district court thus concluded that the witness imparted no tainted testimony to the grand jury in his four appearances before it. As to the grand jury evidence, we hold that this is a sufficient finding to establish that the government has met its burden of establishing by the greater weight of the evidence that it survived the *Kastigar* test.

In *North*, we directed that the inquiry on remand would "proceed witness by witness; if necessary, it will proceed line-by-line and item-by-item." 910 F.2d at 872. Insofar as Kilroy intends to suggest that the district court did not follow the *North* standard, we disagree. When there is but one witness, the finding is inherently witness by witness. In *North*, our direction to proceed "line-by-line

and item-by-item" was specifically only to be done where "necessary." That case involved witnesses who were concededly exposed to the immunized testimony of the defendant, and further involved immunized testimony that was widely disseminated through the news media. This one does not. The district court's finding here as to the single grand jury witness, a finding to be reviewed under a clearly erroneous standard, establishes the lack of necessity for further inquiry.

A conclusion that the government did not use tainted evidence in obtaining an indictment is, of course, not necessarily dispositive of a case. The question remains as to whether the government could establish guilt beyond a reasonable doubt without the use of tainted evidence. *See Kastigar*, 406 U.S. at 461–62, 92 S.Ct. at 1665–66 (the government bears "the heavy burden of proving that all the evidence it *proposes* to use was derived from legitimate independent sources") (emphasis added). Thus, in *North*, we directed the district court to conduct a review of the content and sources of both grand jury and trial witnesses' testimony. *See* 910 F.2d at 872.

█ Here the district court considered the question of how the government intended to proceed at trial and determined "that the government ha[d], at least preliminarily, demonstrated the virtue of the case it propose[d] to offer against Kilroy." 769 F.Supp. at 11. Kilroy argues that the district court's finding is inadequate because it is by its very terms "preliminary." He acknowledges that the district court held that the government did "have available to it both testimonial and documentary evidence sufficient to prove" its case against appellant "which would have (and did) come to light had Kilroy never" given his immunized testimony. But he contends these findings and conclusions by the district court are insufficient to meet the requirements of *North* because of the "preliminary" language employed by the court. Had this been the end of all, Kilroy might have a compelling argument. But the matter does not end there.

As we noted in *North*, "a trial court may hold a *Kastigar* hearing pre-trial, post-trial,

mid-trial (as evidence is offered), or it may employ some combination of these methods." 910 F.2d at 859. Here Judge Jackson obviously intended to employ a combination of those methods. Having made a final determination as to the grand jury evidence, he preliminarily determined the question of trial evidence, deciding, no doubt wisely, to take that question up once again when the record became concrete and not merely predictive. Kilroy thus had the choice to plead not guilty and face a trial at which he could reopen the question, or to enter a conditional guilty plea and preserve the question for appeal on the then-existing record.[4] Having chosen the second, he takes the record as to trial evidence as he finds it, and is stuck with the preliminary finding, which is adequate for the present determination.

■ Thus, unless the district court erred in its determination that there had been no use, Kilroy's appeal fails. We examine that question under the "clearly erroneous" standard. *United States v. North,* 910 F.2d at 855. "A finding is not 'clearly erroneous' unless the reviewing court is left with the definite and firm conviction that a mistake has been made—the finding either is not supported by or is clearly against the weight of the evidence, or induced by an erroneous view of the law." *United States v. Sheard,* 473 F.2d 139, 146 (D.C.Cir.1972). Here this is not the case. The district court's finding is well supported on the record.

■ Kilroy's argument to the contrary is rather convoluted. He sets forth certain facts: In late March 1985, a short article appeared in the interior pages of the *Baltimore Sun* reporting that Kilroy had been indicted in the Nevada case and describing the charges. Some weeks thereafter, James Kim, a private citizen and the controller of NCSC, directed an audit of the NCSC pension plan. Ultimately, the internal audit led to the determination that $573,000 was missing, a fact that NCSC was obligated to report to the Department of Labor. Some time after the commencement of the audit but before the criminal investigation which grew

out of the referral to Labor, the retroactive immunity bargain was entered. Kilroy's theory is that because the statements, about matters unrelated to the embezzlement, that the government purported to retroactively immunize in the plea agreement led to the indictment on the unrelated charges; and because that indictment was reported in the *Baltimore Sun;* and because the government cannot present direct evidence that Kim (now deceased) did not read the article in the *Baltimore Sun,* thus triggering his curiosity about the honesty of Kilroy; the investigation that ultimately led to the charges in the present case was based on a "use" of the immunized statement. We disagree.

Even recognizing, as we did in *North,* that the burden is the government's to establish "that no use whatsoever was made of any immunized testimony," the government has met its burden here. Wagner testified before the grand jury that "at a point in 1984 or '85" the NCSC plan reached 100 participants, which under the Department of Justice regulations required NCSC to retain an outside accounting firm to audit the plan. On a record silent as to Mr. Kim's residence but undisputed that he worked in Washington, D.C.; again silent as to whether or not he read the *Baltimore Sun* on the day in question—or for that matter ever—the district court's finding that the government met its burden of establishing by the greater weight of the evidence that it obtained the indictment without any tainted use survives review. *See North,* 910 F.2d at 872. Accordingly, we conclude that the district court's finding that Kim was "oblivious ... of Kilroy's Las Vegas activities" at the critical time was supported by the evidence of record. *Kilroy,* 769 F.Supp. at 9.

■ As we did in *North,* we assume, without deciding, "that a prosecutor cannot make nonevidentiary use of immunized testimony," any more than evidentiary use, without running afoul of use immunity. *Id.* at 860. In so doing, we recognize, as we did in *North,* that *Kastigar* compels that immunity

---

**4.** The conditional plea option required the approval of the court and the consent of the government. FED.R.CRIM.P. 11(a)(2).

be "coextensive with the Fifth Amendment" in order to satisfy constitutional demands. *Id.* at 859. However, neither *Kastigar* nor *North* nor any other authority with which we are familiar compels a conclusion that the use immunity conferred under the statute or by agreement must broadly exceed that afforded by the Fifth Amendment. Neither are we familiar with any authoritative interpretation of the Fifth Amendment holding that a defendant cannot be indicted on wholly unrelated charges based on evidence wholly unrelated to a compelled confession, simply because the second indictment occurs after a first that was obtained in violation of the defendant's Fifth Amendment rights.

Kilroy would claim that he has done more than establish a *post hoc, ergo propter hoc* relationship between the second indictment and the first, and therefore between the second prosecution and the use of the testimony. His argument rests on the premise that there is a "but for" relationship between the second indictment and the first [5]—a relationship dependent upon the pure speculation that the investigation underlying the present indictment would never have occurred but for the first indictment which would not have occurred but for the immunized statements. That speculation is nothing more than a reformulated recital of the temporal order argument already rejected.

The nearest analogous actual case we have found to Kilroy's concept of "use" is the one rejected in *United States v. Helmsley,* 941 F.2d 71 (2d Cir.1991). In that case, the Second Circuit accepted *arguendo* an appellant's recitation of fact that she had appeared twice before state grand juries to give immunized testimony concerning a state tax avoidance scheme; a *New York Post* reporter read a *New York Times* article implicating her in the state tax avoidance scheme; the information in the *Times* article rekindled the *Post* reporter's interest in a previous tip about the misuse of corporate funds by Helmsley and her husband; the *Post* published an article stating that the Helmsleys had used false invoices to pay personal expenses with corporate funds; that article triggered investigation by the United States Attorney for the Southern District of New York and other authorities, which led to a federal indictment. *See id.* at 77–78, 81.

In rejecting a *Kastigar* challenge to Helmsley's conviction on the new indictment, the Second Circuit held that the triggering of the decision of an independent party to "reopen his earlier investigation" based on "his perception of a 'morality connection'" and his happening upon an incriminating witness as a result did not constitute a tainted use. *Id.* at 83. The court held that nothing in existing authority[6] "suggest[ed] that the Fifth Amendment applies to situations in which the publicity concerning immunized testimony triggers a purely private investigation into an entirely different matter solely because each matter involved dishonest conduct." *Id.* We agree with the Second Circuit. Applying the *Helmsley* reasoning to the present record, even if Mr. Kim became generically suspicious of the moral quality of his employer's fiduciary because that fiduciary came under indictment based on immunized statements in an unrelated matter, it tortures the concept of "use" out of all semantic regularity to suppose that the tainted statement was "used" in obtaining the second indictment.

Accordingly, we conclude that the district court did not err, and certainly did not clearly err, in its finding that there was no use of

---

5. The dissent seems to think that our use of the phrase "but for" in referencing appellant's approach means that we are "ask[ing] whether there was adequate evidence to convict the appellant without drawing upon the immunized testimony...." Dissent at 689. At no point do we imply, or read the district court as implying, that this is the test. However, because the law of immunized testimony under both *Kastigar* and the Fifth Amendment requires that for the defendant to benefit from the protection of the amendment of an immunity agreement, the testimony must be "used" against him, his rights have not been shown to be violated simply by the fact that both the immunized testimony and some subsequent prosecution exist in the same universe. Our contrast of appellant's "but for" argument with the simple co-existence or at most *post hoc* temporal order shown by the evidence, is not intended by us to imply, nor do we think that it does imply, any holding that the sufficiency of the non-immunized evidence is relevant.

6. Specifically citing *United States v. Kerser,* 534 F.2d 511 (2d Cir.1976).

the immunized testimony in the present case.[7]

## IV. CONCLUSION

For the reasons set forth above, we conclude that the district court committed no error in denying Kilroy's motion to dismiss. The judgment appealed from is therefore

*Affirmed.*

SILBERMAN, Circuit Judge, dissenting:

I agree with my colleagues that when the government promised the appellant "retroactive use immunity" as part of his August 14, 1985 plea bargain, it agreed, as a matter of contract, not to use any of his immunized statements against appellant—just as would be so if the government had obtained his testimony under 18 U.S.C. § 6002. It seems rather straightforward and obvious to me that the government, again as a matter of contract, therefore assumed the burden of showing in any subsequent prosecution exactly what it would have to show had the immunization been granted by order rather than as part of the plea agreement. That the government shoulders the "heavy burden," *United States v. North,* 910 F.2d 843, 854 (D.C.Cir.1990), under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), of proving the negative—that the prosecution has not used the "compelled testimony as an 'investigatory lead,'" nor used any "evidence obtained by focusing investigation on a witness as a result of his compelled disclosures," *id.* at 460, 92 S.Ct. at 1664–65—is part of the protection given an immunized witness. The appellant was granted that legal position by the govern-

ment, and he has a legitimate right to assert it fully in this court. I therefore do not understand why the majority comes so grudgingly, *see* maj. op. at 685, to this position.

Be that as it may, I do not think the government has met its burden. The district judge's finding that it did—insofar as it could be described as a finding of fact—is clearly erroneous, but I think the district court (and the majority) decided the issue incorrectly as a matter of law. Both the district court and the majority seem to ask whether there was adequate evidence to convict the appellant without drawing upon the immunized testimony or, put another way, to require that the *appellant* must show that there is a "but for" relationship between the two indictments, *see* maj. op. at 688. That approach seems to me to reverse the burden (the majority's initial discussion does suggest that it believes that the burden properly belongs on appellant rather than the government) and moreover applies a standard not called for in *Kastigar* and which we did not apply in *North.* The question is not whether the use of immunized testimony was prejudicial to a defendant, but rather was *any* use made. If it was, than the government loses—without regard to whether the use was outcome determinative.

The first question which the government is bound to address is: Was Kilroy *targeted* for investigation by the Labor Department because of his prior immunized testimony? This question breaks down into two parts: Was Kim's decision to audit NSCC's funds influenced by knowledge of Kilroy's Las Vegas indictment, and, even if not, was DOL's (and the U.S. Attorney's) decision to focus an

---

7. Kilroy makes a more specific argument that the government made an impermissible nonevidentiary use of his immunized testimony, in that "Mr. Benner directly admitted to seeking out and asking guidance from those individuals who had extensive knowledge of Mr. Kilroy's immunized statements for the sole purpose of advising him and locating untainted witnesses and evidence." Appellant's Br. at 18. Although appellant's assertion is made without citation to the record and does not plainly match up with any factual finding made by the trial court, our review of the entire record leads us to believe that what Kilroy is referring to is not really a steering toward untainted evidence by persons tainted, but a

steering away from tainted evidence. In other words, the conduct by Benner was not a use of the tainted evidence, it was rather an endeavor, apparently successful, to avoid accidentally making such a nonevidentiary use.

We have in the past "assume[ed] without deciding that a prosecutor cannot make nonevidentiary use of immunized testimony," *North,* 910 F.2d at 843. As we determine in this case that no nonevidentiary use is before us, we once again need not decide the question of whether the *Kastigar* prohibitions encompass nonevidentiary as well as evidentiary use. *See generally id.* at 856–60.

investigation on Kilroy "wholly independent" of its confessed knowledge of the indictment. In that respect, the government concedes that, because of the plea agreement, the first indictment and Kilroy's interviews are treated as an immunized package. Kilroy had been interviewed before he was indicted as well as after, but all of his statements were immunized. And his pre-indictment statements are deemed to have led to his indictment in Las Vegas. That is what the parties mean by retroactive immunity. If, then, an Assistant U.S. Attorney in Las Vegas had called Pitt, the Labor Department investigator in Washington, to "alert" Pitt to Kilroy's indictment, there would be no question but that the *Kastigar* test would have been violated.

Instead, the Labor Department was contacted by Williams, an independent auditor whose audit turned up the missing $573,000 and the fact of Kilroy's responsibility. Williams was, in turn, told by James Kim, NSCC's comptroller, to conduct the audit shortly after Kilroy had been indicted. It is not clear from the government's brief whether it concedes that if Kim had learned of the indictment and thus was prompted to ask Williams to conduct the audit, *Kastigar* would have been violated. But, I believe the question is answered by *Kastigar* itself—whether or not one calls this sort of use "non-evidentiary." [1] *Kastigar* said that the immunized witness must not be placed in a position by reason of his testimony that is *any* less advantageous than if he had invoked the Fifth Amendment. That surely means that if Kilroy's testimony is deemed to have been immunized and to have led to his indictment and a private person targets Kilroy for investigation based on knowledge of the indictment, Kilroy's testimony was *used* against him. That a private person, rather than a government official, is one who gains the knowledge and then presents his suspicions—in this case the fruits of an investigation—over to the government is of no significance to the immunized witness. In both cases the immunized witness is worse off—considerably worse off—than he would have

been if he had insisted on his right against self-incrimination.

The majority, however, opines that even if Kim had directed an investigation of Kilroy *because* he learned of the prior indictment *Kastigar* would not have been violated. The majority's view apparently is that, under such circumstances, it cannot be said that Kilroy's immunized statement was "used" against Kilroy. I frankly do not understand why. It certainly cannot be because Kim was not a government official; we crossed that analytical bridge in *North* when we concluded that for *Kastigar* purposes it mattered not that North's immunized testimony was "used" by *non* -government persons (witnesses and their counsel) whose interests were at least somewhat adverse to the defendant, even if the prosecutors were entirely unaware of the immunized testimony. Indeed, it could be thought that this case is *a fortiori* to *North* because Kim's knowledge of the indictment leads directly (at least under the hypothesis) to the audit and hence to the government's investigation whereas in *North* it was argued vigorously that the witnesses' use of the immunized testimony did not affect the government at all. The focus of the word "use" is not on *who* uses the immunized testimony but rather on whether it was used against the defendant—by anyone. Put another way, the way the Supreme Court did in *Kastigar,* has the immunized witness been put in a less favorable position than he would have been if he had pleaded the Fifth Amendment and refused to testify? *See Kastigar,* 406 U.S. at 462, 92 S.Ct. at 1665–66.

To be sure, the Second Circuit in *United States v. Helmsley,* 941 F.2d 71 (2nd Cir. 1991) (upon which the majority relies) took another tack. Although the court assumed a direct causal link between Ms. Helmsley's immunized statements, *The New York Times'* article reporting her testimony, *The New York Post's* investigation, and finally the U.S. Attorney's indictment, the court nevertheless concluded that the fortuitous causal link in that chain circumvented the policies of the Fifth Amendment. Despite my enormous respect for Judge Winter's an-

---

1. *See* maj. op. at 688–89 n. 6.

alytical powers, I confess that his logic here escapes me. He gives as a hypothetical example, from which he reasons, the following:

> If a grand jury witness testifying under a grant of immunity were recognized by a grand juror as the perpetrator of a bank robbery committed the week before, an undeniable causal link between the immunized testimony and a conviction for bank robbery would exist, but a plausible Fifth Amendment argument could not be made.

*United States v. Helmsley,* 941 F.2d at 82. I think his premise is faulty; there is, in that example, *no* link between the bank robber witness' *immunized testimony* and the grand juror's recognition of him as a bank robber. The grand juror would have equally recognized the witness as a bank robber if the witness had come before the grand jury and took the Fifth Amendment. The Second Circuit, as well as the majority here, is obviously uncomfortable with the consequences of the press' reporting of immunized testimony; it can be spread to those out of government who might conclude, based on the reporting, that the witness is a bad person and should be investigated for matters not directly related to the immunized testimony. That is, of course, true, but I do not understand either the Second Circuit or the majority to suggest that a *government investigator,* having learned of immunized testimony by reading of it in the newspapers, could start an investigation of the witness without leading the government afoul of *Kastigar.* Therefore, I do not see any principled reason to permit the government to gain the benefit of circumventing *Kastigar* by employing a private actor, even unwittingly, to do what the government itself could not. Nor do I think the majority (and the Second Circuit) have a legitimate concern that applying *Kastigar* to such a situation would somehow extend use immunity beyond the Fifth Amendment protection it replaces. Surely, one of the advantages of taking the Fifth Amendment was preventing the possibility that your testimony would be used against you indirectly, through newspaper accounts that might lead

investigators—public or private—to explore matters not directly germane to transactions about which a witness was questioned. *Kastigar* made clear that the constitutionality of section 6002 depended on a witness not being put in a worse position by reason of a grant of use immunity than he would have been prior to passage of the statute. And the court emphasized that focusing an investigation on the witness because of his immunized testimony would result in just that worsening of position. *See Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664–65. Typically (one hopes) a witness' immunized testimony will not pass to newspapers, but surely it is the government and not the witness, given the underlying constitutional concerns, that must bear the risk of that occurring.[2]

In our case, although the appellant understandably emphasizes *The Baltimore Sun* article as a possible reason why Kim ordered an audit, we really do not know why he did so. But it is not the appellant's burden to provide the reason. The gap in the record represents a failure of the *government's* proof. Of course, Kim is dead, but the government did not even produce testimony from other company officials to attempt an explanation (I think it is virtually inconceivable that Kim did not discuss the matter with his associates). The government rested on the speculative testimony of a government employee, Wagner, that the company likely would have ordered an audit sometime because of a regulatory change.[3] I do not think, under the circumstances, that testimony is enough to establish that Kim was not influenced by Kilroy's immunized testimony.

Even if Kim's decision to order an audit of NSCC's funds, however, was "wholly independent" of knowledge of Kilroy's Las Vegas indictment, Kilroy's immunized testimony would still have been used against him in violation of *Kastigar* if Pitt's decision (made in conjunction with AUSA Benner) to investigate Kilroy was influenced, at least in part, by knowledge of that indictment. Under *Kastigar,* the government has the burden of

---

**2.** Otherwise, we would be creating a perverse incentive to leak immunized testimony to the press in hope that someone else would act upon such information.

**3.** *See* maj. op. at 687–88.

disproving that influence. Yet the government concedes that Pitt was informed of that indictment at the October 1985 meeting with Williams and the NSCC management.

In early October, 1985, Pitt received a letter from Williams, NSCC's outside accountant, stating that he had conducted an audit of certain pension funds sponsored by the NSCC and that there were funds missing. Williams requested a meeting with Pitt to discuss his findings, and the meeting was scheduled for October 17, 1985, between Pitt on the one hand, and Williams, Mozer (NSCC counsel), and NSCC's assistant comptroller on the other. At the meeting, the participants discussed with Pitt the findings reached by Williams, namely that funds were missing and that they had been taken by Kilroy. Williams told Pitt that Kilroy's attorney had confirmed the amount of funds missing. Significantly, Pitt received from one of the participants a copy of Kilroy's indictment in Las Vegas.

That afternoon, without conducting an investigation of his own, Pitt called Benner, the Assistant U.S. Attorney, and arranged to meet with him to discuss a possible criminal investigation. When they met the following day, Pitt brought a copy of Kilroy's Las Vegas indictment. Based on the indictment, Benner called Parry, the AUSA in Las Vegas, to determine, in part, whether immunity had been granted to Kilroy regarding a possible NSCC embezzlement. Benner was informed that Kilroy had only been given transactional immunity for dealings with Osterer and that Osterer was not involved in the NSCC embezzlement. Benner was also told

by Parry that Kilroy had confessed in Las Vegas to the NSCC embezzlement. The civil investigation by Pitt was formally opened on December 13, 1985.[4]

Wagner commenced his criminal investigation in December of 1986 and testified before a grand jury for the first time in March of 1987. That testimony was based solely on Pitt's conclusions and report. For some reason, not clear from the record, the government did not pursue an indictment for quite some time. Wagner appeared three more times in 1990 before a grand jury, and an indictment followed closely thereafter.

In February 1988, that is, two years before Wagner's 1990 grand jury testimony, Pitt had travelled to Baltimore and reviewed all of the FBI records relating to Kilroy's debriefings, including those relating to the NSCC embezzlement, thus tainting himself irretrievably. He drafted a summary of his new-found conclusions and apparently placed that summary in a manila envelope in a file not accessible to Wagner.

At the *Kastigar* hearing below, however, Pitt testified that following his trip to Baltimore he had a conversation with Wagner in which he "gave him a summary of some of the stuff I looked at." Pitt could only *specifically* recall telling Wagner that Mozer's name had appeared in a suspected racketeer's rolodex—a possibly incriminating piece of information about the lawyer that was never pursued. As the cross-examination of Pitt clarifies, Pitt did not testify that that was *all* he told Wagner; he simply could not recall anything else specifically.[5]

**4.** The majority mistakenly states that the civil investigation was opened in October 1985.

**5.** Pitt's exact testimony, in relevant part, was as follows:

### Direct
Q: Did you have any conversations with Agent Wagner following your trip to Baltimore and your review of these records that you've described?
A: Yes, Sir.
Q: Did you tell him—first of all, did you give him copies of the documents that you brought back?
A: No, Sir.
Q: Did you tell him what documents you had seen or copied up there?

A: *My best recollection is I gave him a summary of some of the stuff I looked at.* I did not give him a detailed listing or accountability [sic] as to what I reviewed.
Q: What's your best recollection of what you told Agent Wagner that you had discovered in your trip to Baltimore in February of '88?
A: The only thing I specifically recall is we were in the hallway outside of his office approximately three-or-four days after I returned. He inquired as to how it went. I do specifically recall mentioning to him that Mr. Mozer's name had turned up in either a telephone listing or a rolodex listing from an individual who was a known crime figure out of Buffalo, New York, who had been assassinated.
Q: Do you recall telling Agent Wagner anything else you had learned in Baltimore?

If Pitt's decision to investigate Kilroy was based in part on the knowledge that Kilroy was indicted of various crimes of dishonesty in Las Vegas and if that indictment was in turn based on Kilroy's immunized testimony, then Pitt's decision to focus investigation on Kilroy indirectly resulted (in part) from Kilroy's putatively compelled testimony. *Kastigar* would, therefore, have been violated. In other words, Kilroy was placed in a decidedly inferior position because of his immunized testimony.

When a government investigator actually obtains potentially incriminating information (in this case the Las Vegas indictment) directly traceable to immunized testimony and then decides to focus investigation on the protected witness, I rather doubt that the government can *ever* prove that that decision was "*wholly* independent" of the witness' testimony. There is no need for me to so conclude here, however, because the government offered no testimony whatsoever to disprove the link between Pitt's decision to investigate Kilroy and Pitt's knowledge that Kilroy had been indicted on insurance racketeering in Las Vegas.[6] And circumstantial evidence suggests that a link may in fact have existed. Pitt, without any investigation on his part, contacted an assistant United States attorney (Benner) to arrange an immediate meeting to discuss a likely criminal case. Is that standard procedure in the Department of Labor when a private auditor complains of missing funds? Would an investigator at the Labor Department always contact an assistant United States attorney based solely on the accusations of a private auditor? On these questions, there is a complete failure of proof by the government. The government offered no testimony to establish what DOL procedures were. For example, if DOL always opened formal investigations whenever a complaint involving more than a given dollar amount arrived, that might be one thing. Pitt's precipitous decision might well have been influenced, however, by his suspicions that Kilroy was a crook, suspicions grounded on the Las Vegas indictment. And Benner himself testified that he was told by an assistant United States attorney in Las Vegas that Kilroy had actually confessed to the NSCC embezzlement *before* his second conversation with Pitt authorizing the investigation and that he conveyed that information to Pitt.

So Pitt was exposed to tainted information prior to deciding to focus investigation on Kilroy, and both Pitt and Benner knew of Kilroy's confession of the NSCC embezzlement prior to the formal inception of the investigation. To be sure, Williams had informed Pitt at their first meeting that Kilroy's attorney had confirmed the amount of funds missing, and that fact by itself *might* have led Pitt to act as he did. The absence of any proffered evidence by the government on this matter leaves me able only to speculate on these questions and, hence, unable to conclude that the government has met its *Kastigar* burden.

I am even more troubled by the government's inability to document the extent to which Wagner was tainted by his conversation with Pitt following the latter's 1988 Baltimore trip, and would reverse for that reason alone. In determining that there was no *Kastigar* violation, the district court relied heavily on its finding that "[a]t no time was the criminal investigator [Wagner] privy to information developed by the government

A: That is the only thing I can specifically recall.

. . . . .

Cross–Examination

Q: To pick up where the government left off for a moment, when you testified that you talked to Mr. Wagner about your review of the F.B.I. case files in Baltimore, you stated that you don't recall discussing more information with him than what you have already testified to, correct?
A: Yes, sir.
Q: Now, you're not testifying that you didn't discuss more information. That you just don't recall discussing more information, is that correct?
A: That is correct.
Q: So you can't actually testify as to what information he received from you of your review of the F.B.I. files in Baltimore?
A: Within limitations I can, yes, sir.

6. To say nothing of the fact that both Pitt and Benner knew that Kilroy had actually confessed in Las Vegas to embezzling funds from NSCC *before* they made the formal decision to investigate Kilroy.

from Kilroy himself." *United States v. Kilroy*, 769 F.Supp. 6, 10 (D.D.C.1991) (emphasis added). Even the government concedes that that finding is erroneous. The government admits that Pitt gave Wagner at least one piece of information that Pitt had discovered *after* reviewing all of the tainted files in February of 1988 in Baltimore—that Mozer's name had turned up in a suspected racketeer's rolodex. Wagner was tainted, then, *prior to* his three 1990 grand jury appearances. The government continues to assert, however, that "once Pitt was exposed to the immunized statements, he carefully segregated that material and, with the exception of the one irrelevant lapse . . . did not relate that information to Wagner." That assertion distorts the record. As set out above, Pitt candidly admitted that he told Wagner *more* than simply this one, probably inconsequential, tidbit, that he gave Wagner a "summary of some of the stuff I found." That statement, by the government's own investigator, renders the district court's finding that Wagner was not privy to *any* tainted information clearly erroneous. And Pitt's inability to recall specifics makes it impossible for any court to rule out, and—more important—for the government to disprove, the possibility that Kilroy's testimony was *in any way* "used" by the government. With the burden on the government, Pitt's lack of memory is fatal.[7]

\* \* \* \* \* \*

I suspect that underlying the majority's conclusion contrary to mine is the notion that where, as here, the independent documentary evidence of guilt is strong enough, and where *private* individuals had on their own uncovered at least some evidence of criminality, any governmental reliance on tainted information was unnecessary, perhaps even gratuitous, and thus reversal is unwarranted. But *Kastigar* requires the government to prove far more than that it *could* or indeed *would* have developed its evidence free of taint. *Kastigar* "imposes on the prosecution the affirmative duty to prove that the evidence" it gathered *was in fact* "derived from a legitimate source *wholly independent* of

the compelled testimony." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664–65 (emphasis added). The government has not met this burden.

Of course, my opinion is based on the proposition that the *reasoning* of *Kastigar*, written by Justice Marshall, is applicable law. I believe that my position follows logically from that reasoning. I take it that the majority, by not responding to my dissent, essentially concedes its logic. I operate on the premise that notwithstanding Justice Holmes' famous axiom the essence of legal reasoning, and thus law, is logic—which is why I believe that there is, at least theoretically, a right answer to every case (to be sure, as imperfect humans we may not always find it). I must admit, however, that some Supreme Court justices disagree with these propositions, explicitly or implicitly, and so the reasoning of prior opinions written by other justices may not be followed—even when those prior opinions are not overruled. Instead, often a case is decided in accordance with a majority's present intuition. In that regard, I have great respect for my colleagues' intuition on the issues presented by this case—indeed, I originally shared it myself—so their intuition may well be a reliable predicator as to the ultimate Supreme Court resolution of those issues. But logic led me inexorably in another direction.

\* \* \* \* \* \*

Therefore, I respectfully dissent.

---

7. The majority—by approving the district court's finding that *no* taint occurred—rejects, without explanation, the government's concession that Wagner had been at least partially tainted by Pitt prior to the former's 1990 grand jury appearances.