**UNITED STATES of America,**

v.

**BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.**

**No. 91–0655 (JHG).**

United States District Court, District of Columbia.

Aug. 26, 1997.

U.S. Dept. of Justice, Stefan D. Cassella, Robert C. Dalton, for the Government.

John P. Hume, Kara M. Sacilotto, Perkins Coie, Washington, DC, for Defendants.

## *In re* Second Round Petition of Amjad Awan

JOYCE HENS GREEN, District Judge.

### *MEMORANDUM OPINION AND ORDER*

Presently before the Court is the United States' motion to dismiss the Second Round Petition of Amjad Awan, a former employee of Defendant Bank of Credit and Commerce International, S.A., who was convicted of money laundering in 1990 in connection with his employment. *See United States v. Awan,* 966 F.2d 1415 (11th Cir.1992). Seeking the proceeds from the 1992 sale of a condominium in Washington, D.C., Awan filed the instant petition pursuant to 18 U.S.C. § 1963(*l*) ("L–Claim"). For the reasons stated below, both the motion to dismiss and Awan's L–Claim will be held in abeyance pending a hearing under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

### Background

The following facts are assumed to be true for the purposes of this motion. Beginning in 1982, Awan managed the personal bank accounts of General Manuel Noriega. As such, he was authorized to deposit and with-

draw money from Noriega's accounts with BCCI, including the account at BCCI (London), which was opened in 1984 after being transferred to London from BCCI (Panama). Awan Aff. ¶ 3. In 1984, Awan was transferred to BCCI's Washington office, where in addition to other duties, he continued to manage Noriega's accounts. *Id.* ¶ 4.

In 1986, Awan decided to purchase-condominium # 723 East, at 4201 Cathedral Ave., N.W., in Washington, D.C., for $175,000. *Id.* After making a down payment from his personal checking account in the amount of $17,-500, Awan intended to rely upon a gift from his father in Pakistan to pay the balance. *Id.* ¶ 5. However, after he learned that the gift from his father would not arrive by wire transfer in time for closing, he asked General Noriega for a personal loan. Noriega agreed, and, on August 20, 1986, Awan directed the transfer from Noriega's account at BCCI (London) to First American Bank in Washington, D.C. *Id.* ¶¶ 6–7.

On September 25, 1986, pursuant to Awan's direction, First American issued a cashier's check made payable to Homeowner Guardian and Title in the amount of $161,-079.94. *Id.* ¶¶ 8–9. The transaction was then completed, and Awan claims that he later repaid Noriega's loan: "When the funds to repay the loan from General Noriega became available from my father, Noriega instructed me to have the funds deposited in his account at a Panamanian bank. In accordance with General Noriega's instructions, I asked my father to transfer money to General Noriega's account, a non-BCCI Panamanian Bank." *Id.* ¶ 10.

In 1988, Awan and other BCCI employees were indicted in the Middle District of Florida for offenses arising out of a conspiracy to launder illegal drug proceeds through BCCI. On July 29, 1991, Awan was convicted and later sentenced to 12 years in prison. *Id.* ¶ 12. His conviction was affirmed on appeal. *See United States v. Awan,* 966 F.2d 1415 (11th Cir.1992).

Under a grant of use immunity, *see* 18 U.S.C. § 6002,[1] Awan testified at Noriega's

---

1. This statute provides, in relevant part, that

when a witness testifies under a grant of use

trial and cooperated in BCCI-related investigations. Awan Aff. ¶ 13 & Ex. P (letters granting use immunity). "Awan met extensively with Tampa prosecutors, as well as with the Noriega prosecution team from Miami." Hume Affidavit ("Aff.") ¶ 3. And during these debriefings, "there were extensive discussions about the Cathedral Avenue property and the fact that the funds came from a loan from General Noriega." *Id.* Awan disclosed to the prosecutors his financial relationship with Noriega, because it was contemplated that he would be testifying against Noriega. *Id.* ¶¶ 4–5. Noriega was later convicted of conspiracy to commit racketeering, racketeering, conspiracy to import and distribute cocaine, manufacture of cocaine, conspiracy to manufacture, distribute, and import cocaine, and traveling in interstate or foreign commerce to promote unlawful enterprise. *United States v. Noriega,* 746 F.Supp. 1506 (S.D.Fla.1990), *conviction aff'd,* 117 F.3d 1206 (11th Cir.1997). As a result of Awan's cooperation, Awan's sentence was reduced to six and one-half years and $95,000 of his $100,000 fine was remitted.

In February 1991, Awan also met with prosecutors from the New York District Attorney's Office in Manhattan in connection with the investigation of BCCI, First American Bank, Robert Altman and Clark Clifford. "The subject of the Cathedral Avenue property and the loan from General Noriega was discussed extensively. This information was also given pursuant to use immunity." Hume Aff. ¶ 5. Awan's counsel was advised later that summer that "information that Mr. Awan provided to the Tampa Office was being shared continually with the United States Department of Justice Criminal Division, which had assumed control of the overall BCCI investigation and prosecution." *Id.* ¶ 7.

Amidst Awan's legal travails, BCCI collapsed.[2] In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI,* 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment, which included charges of conspiracy, wire fraud and racketeering against BCCI, was filed in this Court. On December 19, 1991, a Superseding Information was filed in which Awan was named as a participant in connection with six predicate acts of money laundering. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. See Transcript of Guilty Plea Proceedings at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

---

immunity, "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

2. "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

Under paragraph 9 of the Plea Agreement and pursuant to the Order of Forfeiture, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates).

Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, which directed immediate seizure of the specific assets listed therein. The Court later amended the Order of Forfeiture to include additional assets, including property set forth in a Second Supplemental Lists of Forfeited Property. *See* Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture). The property Awan seeks was seized pursuant to the Second Order.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of Cen-Trust, if any." *Id.* ¶ 12(f). Resulting from BCCI's guilty plea and the subsequent criminal forfeiture proceedings, by July 1996 the United States had "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[3]

In 1992, Awan attempted to sell the condominium, but the government learned of the sale and moved to amend the Order of Forfeiture to include the proceeds of that sale.[4]

---

3. In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24, *id.* at 2, and, on May 22, 1997, Attorney General Janet Reno "determined that the United States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all BCCI victims equally on a pro rata basis." Notice to the Court at 2 (filed July 11, 1997).

4. In its motion to amend the Order of Forfeiture, the government stated "Awan had purchased [the condominium] with funds from one of the defendants. Because the proceeds of the sale of the condominium are traceable to property held by BCCI, S.A., they are forfeitable to the government under ¶ 1(e) of the Order of Forfeiture." Mot. to Amend Order of Forfeiture at 5 (filed June 24, 1992). This government also stated that its assertion was premised on documentary evidence available to it indicating that, as an employee of BCCI's Washington office, Awan re-

This Court granted the motion, and the government later provided Awan with notice of the seizure. Awan's timely L–Claim followed.[5]

Awan contends that BCCI has no interest in the condominium purchased in 1986, because he relied upon a "bridge loan" from Noriega that he later repaid. Awan argues that forfeiture under 18 U.S.C. § 1963(*l* )(6)(A) "is not appropriate because [he] has exclusive title to the property and the proceeds of its sale," L–Claim at 1 (as amended), and that he "qualifies as a bona fide purchaser for value under 18 U.S.C. § 1963(*1* )(6)(B) because he purchased the condominium for fair value without knowledge that his property would be subject to forfeiture." *Id.* at 2. Alternatively, Awan asks the Court to vacate the Order of Forfeiture (as applied to such proceeds) unless and until the United States can prove it did not rely on his immunized testimony to seek forfeiture of the condominium's proceeds. *Id*

The United States subsequently moved to dismiss Awan's L–Claim on the grounds that 18 U.S.C. § 1963(*l* )(6)(A) is inapplicable to Awan's case, and that Awan cannot, as a matter of law, be considered a bona fide purchaser for value pursuant to 18 U.S.C. § 1963(*l* )(6)(B).

### Discussion

The threshold question presented is whether *Kastigar* applies to L–Claim proceedings and, if so, whether Awan is entitled to a *Kastigar* hearing. While it is undisputed that Awan was granted use immunity under 18 U.S.C. § 6002, the parties dispute whether *Kastigar* applies to third-party petitions under 18 U.S.C. § 1963(*l* ). Awan argues that because he was granted use immunity for his testimony in connection with *United States v. Noriega* and BCCI-related investigations, the government must first demonstrate under *Kastigar* that it did not rely on that testimony in seeking forfeiture

of the proceeds of the condominium sale. The government opposes, stating that *Kastigar* is inapplicable to L–Claim proceedings.

■ Whether Awan's grant of use immunity extends to these proceedings turns upon whether a criminal forfeiture proceeding is a criminal case within the meaning of 18 U.S.C. § 6002. The underlying case is, of course, criminal even if Awan is not the defendant. Forfeiture proceedings, whether civil or criminal, have often been held or assumed to be criminal in nature. *See, e.g., One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965); *Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886); *United States v. Buena Vista Ave., Rumson, N.J.*, 937 F.2d 98, 103 n. 3 (3rd Cir.1991), *aff'd on other grounds*, 507 U.S. 111, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993); *In re Heimerle*, 788 F.Supp. 700, 702–03 (E.D.N.Y. 1992). *Cf United States v. Ursery*, 518 U.S. 267, ——, 116 S.Ct. 2135, 2147, 135 L.Ed.2d 549 (1996) (*in rem* civil forfeiture proceedings not punitive for the purposes of the double jeopardy clause); *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 775–79, 114 S.Ct. 1937, 1944–45, 128 L.Ed.2d 767 (1994) (sanction labeled as civil could have punitive character). While no authority is directly on point regarding RICO criminal forfeiture in the context of third-party petitions, the case law relative to the criminal nature of forfeiture proceedings is persuasive. Also persuasive is the Supreme Court's *dicta* in *Kastigar* stating that use immunity "leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege." 406 U.S. at 458–59, 92 S.Ct. at 1664 (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964)). With respect to 18 U.S.C. § 6002, the Supreme Court explained in *Kastigar* that this statute assures that the

---

ceived loans from BCCI. *Id.* at Ex. B. In its instant motion to dismiss, the United States reasserted the earlier basis for its motion to amend the Order of Forfeiture and contended that there was no "connection between the forfeiture and Awan's testimony" Motion to Dismiss at 10.

**5.** Awan originally sought $140,478.46. However, the United States later moved to exclude $76,378.65 that it determined was exempt from forfeiture pursuant to Justice Department guidelines regarding attorneys fees. United States' Notice of Compliance at 2 (filed Jan. 17, 1996). Awan now seeks the balance, which remains in the custody of the U.S. Marshals Service.

compelled testimony "can *in no way* lead to the infliction of criminal penalties." *Id.* at 461, 92 S.Ct. at 1665 (emphasis added).

The statute here plainly proscribes the "indirect" use of testimony or information compelled under the grant of immunity, and while the intent of criminal forfeiture is to forfeit the property of the defendant, where it potentially deprives a third party of property, it is no less punitive. Whether or not an individual is the actual defendant, where he or she is faced with the potential to lose property in which that person claims an interest, the third-party petitioner is the real party in interest, making the result potentially punitive.

The government has cited no authority to support the contrary proposition, and this Court's independent research reveals none on point. Consequently, this Court determines that RICO third-party criminal forfeiture proceedings under 18 U.S.C. § 1963(*l*) are "criminal cases" within the meaning of 18 U.S.C. § 6002.

 To be entitled to a hearing under *Kastigar,* Awan "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." 406 U.S. at 461–62, 92 S.Ct. at 1665. Accepting Awan's alleged facts as true for the purposes of this motion, Awan has carried his threshold burden. The burden now shifts to the government to prove at a hearing that it derived its information regarding the condominium from untainted sources. The government contends that there was "no connection between the forfeiture and Awan's testimony." Motion to Dismiss at 10. While the government may, in fact, be able to prove this, Awan is entitled to a hearing at which the United States will carry the burden of proof *See United States v. Kilroy,* 27 F.3d 679, 683 (D.C.Cir.1994), *aff'g,* 769 F.Supp. 6 (D.D.C.1991); *United States v. North,* 910 F.2d 843, 855, *reh'g granted in part,* 920 F.2d 940 (D.C.Cir.1990), *cert denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the United States' motion to dismiss the petition of Amjad Awan will be held in abeyance. Within thirty (30) days of the date of this Memorandum Opinion and Order, the parties shall meet and confer to discuss this matter, and, on or before **October 15, 1997,** they shall file a joint memorandum identifying their joint or, as appropriate, separate positions regarding (1) the need for limited discovery, if any; (2) the number of witnesses each party will call; (3) a summary of expected testimony, if any; (4) the length of time each witness will require for direct examination; and (5) a list of exhibits that will be offered into evidence. An evidentiary hearing will be set upon reviewing the joint memorandum.

IT IS SO ORDERED.