**Opinion issued August 13, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-22-00773-CR**

———————————

**THOMAS JOSEPH BLOXHAM, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 207th District Court[1]**
**Comal County, Texas**
**Trial Court Case No. CR2018-382**

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal from the Court of Appeals for the Third District of Texas to this Court. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). We are unaware of any conflict between precedent of that court and that of this court on any relevant issue. *See* TEX. R. APP. P. 41.3.

## OPINION

Thomas Bloxham appeals his conviction for theft by a public servant, for which he was sentenced to 10 years' imprisonment. His principal argument is that the court erred by not dismissing the indictment against him after his Fifth Amendment rights were violated when he was indicted despite receiving use immunity for his compelled grand jury testimony. He also argues that the trial court erred in excluding evidence and that there was jury charge error.

We hold that the State failed to meet its burden to prove that its evidence derived from legitimate sources, untainted by Bloxham's immunized grand jury testimony. We reverse and render judgment dismissing the indictment.

### Background

Thomas Bloxham was the Assistant Superintendent for Comal Independent School District. He worked in support services under Superintendent Dr. Marc Walker. The school district had several bond projects for new construction. Bloxham oversaw the bonds and ensured that the construction was completed effectively. The Attorney General's office investigated Bloxham and Walker's activities as upper-level employees of Comal County Independent School District. After a multi-year investigation with the Comal County Sheriff's Office, the Attorney General's office's findings were summarized in a report. The allegations in the report included that Bloxham and Walker charged the school district for

2

construction-related work that occurred at their own homes. As to Bloxham, the allegations included that the school district paid for a concrete slab on his personal property. Several air conditioning units purchased by the school district were installed and found at Bloxham's residence, and a metal building at the high school that was supposed to be demolished was instead moved to Bloxham's property. While Bloxham paid for the building, the price he paid was less than the school district could have received for the scrap metal.

In February 2016, Bloxham was subpoenaed to testify before a grand jury in Comal County. He appeared before the grand jury and refused to answer questions, invoking his Fifth Amendment rights. The Comal County District Attorney's office then sought and received an order from the trial court compelling Bloxham to testify in exchange for immunity. Bloxham testified before the grand jury in March 2016. In June 2016, Bloxham was indicted for theft by a public servant, money laundering, and misapplication of fiduciary property. Bloxham moved to quash the indictment and for a *Kastigar* hearing, alleging that the State had violated his Fifth Amendment right by using his immunized testimony to indict him. *See Kastigar v. United States*, 406 U.S. 441, 460–61 (1972) (holding that once defendant demonstrates he testified under grant of immunity and was indicted, State must prove that evidence it proposes to use is derived from a source wholly independent of the compelled testimony). The district attorney's office then presented

Bloxham's case to a second grand jury in 2018. The jury returned a nearly identical indictment.

The trial court held a hearing on the *Kastigar* issue. The State presented two witnesses: the Attorney General's investigator and the district attorney who presented the second indictment. The trial court held that the State could not use evidence procured after Bloxham testified before the grand jury. The trial court did not specify what evidence could or could not be used based on this holding. The court also implored Bloxham to object if such evidence was presented during his trial. Bloxham proceeded to a jury trial and was found guilty of theft by a public servant. The court sentenced him to 10 years' imprisonment. He appealed.

## *Kastigar*

On appeal, Bloxham contends that the trial court erred by not dismissing the indictment against him following the *Kastigar* hearing. He argues that the indictment, issued after his immunized, compulsory testimony before the grand jury, violates his Fifth Amendment rights. He also argues that the trial court did not follow the proper procedure during the *Kastigar* hearing nor use the appropriate burden of proof. The State responds that Bloxham's testimony did not impact its investigation and that it established independent sources for all its evidence.

## A.    Standard of Review and Applicable Law

"Among the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies.'" *Kastigar*, 406 U.S. at 444 (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 93–94 (1964) (White, J., concurring)). "The power to compel testimony is 'firmly established in Anglo-American jurisprudence.'" *State v. Hatter*, 665 S.W.3d 584, 590 (Tex. Crim. App. 2023) (quoting *Kastigar*, 406 U.S. at 443). "The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor." *Kastigar*, 406 U.S. at 443–44.

The power to compel testimony is not absolute and is subject to several exceptions, "the most important of which is the Fifth Amendment privilege against compulsory self-incrimination." *Hatter*, 665 S.W.3d at 589 (quoting *Kastigar*, 406 U.S. at 444). The Fifth Amendment provides in pertinent part that, "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. The scope of the right against self-incrimination protects a person "not only against being involuntarily called as a witness against himself in a criminal prosecution, but also permit[s] him 'not to

5

answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *In re Medina*, 475 S.W.3d 291, 299 (Tex. Crim. App. 2015) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).

Immunity statutes and agreements strive to strike a balance between the power to compel and the privilege against self-incrimination. *Hatter*, 665 S.W.3d at 590 (citing *Zani v. State*, 701 S.W.2d 249, 252 (Tex. Crim. App. 1985)); *see Kastigar*, 406 U.S. at 446. Immunity recognizes the importance of required testimony and the belief that very often "only those implicated in the crime have any useful knowledge of its particulars." *Zani*, 701 S.W.2d at 252. Immunity also has "historical roots deep in Anglo-American jurisprudence[.]" *Kastigar*, 406 U.S. at 445–46. Given the difficulty in uncovering criminal activity, immunity is a "pragmatic and necessary tool in criminal prosecution and prevention." *Zani*, 701 S.W.2d at 253.

In *Kastigar*, the Supreme Court held that the Fifth Amendment permits the prosecution to compel an accused to testify against himself, so long as the government provides use and derivative-use immunity to the accused. *Kastigar*, 406 U.S. at 453. The government may compel a witness to testify, but in return for the testimony, the government must offer the witness immunity from prosecution or from any use of the evidence against the immunized witness. *Hatter*, 665

6

S.W.3d at 590 (citing *Murphy*, 378 U.S. at 79). "Immunity . . . is the coin the government must pay to obtain the waiver of a person's right against self-incrimination and the information that he has about some crime." *Smith v. State*, 70 S.W.3d 848, 861 (Tex. Crim. App. 2002) (Cochran, J., concurring). "The term 'full-use immunity' includes both direct use of the declarant's self-incriminatory words and any evidence obtained indirectly or derivatively by investigating leads obtained from those words." *Dansby v. State*, 448 S.W.3d 441, 453 n.7 (Tex. Crim. App. 2014) (Cochran, J., concurring) (quoting *Kastigar*, 406 U.S. at 457); *see also Kastigar*, 406 U.S. at 457 (explaining distinction between direct and indirect or derivative use immunity and stating only full-use immunity substitutes for Fifth Amendment right against self-incrimination). Immunity from use and derivative use of compelled testimony guarantees that "'the witness and the [prosecution are left] in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Kastigar*, 406 U.S. at 458–59. Because the immunity is coextensive with the Fifth Amendment privilege, it "prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore ensures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* at 453.

Once a defendant demonstrates that he testified pursuant to a grant of immunity, the State has the "heavy burden" to negate the possibility that the

immunized testimony has tainted the prosecution and to prove affirmatively that the evidence it proposes to use at trial is "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460, 462. The burden is more than just negation of taint. *Id.* To carry its burden, the prosecution must show that it did not use the compelled testimony or its fruits against the defendant in any manner in connection with the prosecution. *Murphy*, 378 U.S. at 79.

*Kastigar* did not go beyond setting out these tenets and did not establish the procedure or standard for demonstrating that the prosecuting authority's case is not tainted by immunized testimony. No Texas case outlines the burden of proof or procedure for a *Kastigar* hearing. Federal circuits also differ on the standard of proof. *Compare United States. v. Cantu*, 185 F.3d 298, 301–02 (5th Cir. 1999) (holding government must prove by preponderance of the evidence that evidence it proposes to use derives from sources independent of compelled testimony) *with United States v. Hossbach*, 518 F. Supp. 759, 772 (E.D. Pa. 1980) (requiring government to prove clear and convincing evidence of same).

As to the burden of proof in Texas, the appellate court in *Oliver v. State* considered a similar issue when it considered whether proffered evidence was tainted by exposure to an immunized statement protected by *Garrity v. New Jersey. Oliver v. State*, No. 05-18-01057-CR, 2020 WL 4581644, at *3 (Tex. App.—

Dallas Aug. 10, 2020) (mem. op., not designated for publication), *pet. dism'd, improvidently granted*, 2022 WL 2240200 (Tex. Crim. App. June 22, 2022). In *Oliver*, the appellant sought review of the trial court's decision of *Garrity* protection for three statements made by a law enforcement officer. Generally, *Garrity* prohibits the use of statements in subsequent criminal proceedings obtained from law enforcement under threat of removal from office. *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). *Garrity* allows two investigations of an officer's conduct to proceed, one internal and one criminal, while preserving the officer's Fifth Amendment right against self-incrimination. *Oliver*, 2020 WL 4581644, at \*2. If the government compels self-incriminating testimony from the officer in the internal investigation, it must offer immunity to the officer in the criminal proceeding, putting the officer in substantially the same position he would have been had he claimed his Fifth Amendment right. *Id.* (citing *United States v. Slough*, 641 F.3d. 544, 549 (D.C. Cir. 2011) and *Kastigar*, 406 U.S. at 458). In *Oliver*, the court held that if the defendant carries his burden of showing that the statement is protected by *Garrity*, the State must prove, by a preponderance of the evidence, that all the evidence it plans to use against the defendant "proceeded from legitimate independent sources." *Oliver*, 2020 WL 4581644, at \*3 (citing *Slough*, 641 F.3d at 550; *Kastigar*, 406 U.S. at 461–62). Given the similarity in the State's burdens under *Garrity* and under *Kastigar*, we review whether the State

9

met its burden by a preponderance of the evidence to establish that its evidence derived from independent sources from the compelled testimony.[2]

We review the trial court's *Kastigar* rulings, which are mixed questions of law and fact involving Fifth Amendment rights, employing a bifurcated standard of review: we give almost total deference to the trial court's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor; we review de novo the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor. *See Oliver*, 2020 WL 4581644, at *4 (citing *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012)).

## B.     Testimony at the *Kastigar* Hearing

Before trial, the court held a hearing on Bloxham's *Kastigar* motion. The purpose of the hearing was to determine the degree to which any immunized testimony might have been used in the prosecution of the case. Before the hearing, the parties stipulated to the following facts:

---

[2]     We note that the defendant's burden is different for a *Garrity* protected statement. In *Oliver*, the court held that a defendant asserting that a statement is protected by *Garrity* has the initial burden to show that evidence was tainted by exposure to his immunized statement. *Oliver v. State*, No. 05-18-01057-CR, 2020 WL 4581644, at *3 (Tex. App.—Dallas Aug. 10, 2020) (mem. op., not designated for publication) *pet. dism'd, improvidently granted*, 2022 WL 2240200 (Tex. Crim. App. June 22, 2022). In contrast, *Kastigar* dictates that once the defendant demonstrates that he testified pursuant to a grant of use-immunity, the State has the burden to prove that the evidence it proposes to use "is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460 (1972).

- On February 23, 2016, Bloxham was subpoenaed to testify before the grand jury in Comal County.

- On March 2, 2016, Bloxham and Walker appeared before the grand jury. Each independently refused to answer questions and invoked his Fifth Amendment privilege against self-incrimination.

- On March 2, 2016 the district attorney filed an application for order requiring their testimony and granting use immunity to Bloxham and Walker in Comal County district courts. Both defendants appeared with counsel. The district attorney confirmed that they were the targets of the grand jury before which they were being called in to testify. The court ordered Bloxham and Walker to appear and testify under threat of contempt pursuant to the State's forced grant of testimonial immunity. Later that day, Walker testified before the grand jury and Bloxham testified thereafter.

- On June 8, 2016, both were indicted.

At the *Kastigar* hearing, the State called Lieutenant W. Rubio, an investigator with the Attorney General's office, to testify. After Lieutenant Rubio began to testify, the court clarified the standard it would impose for the hearing. The trial court stated that because *Kastigar* is a Fifth Amendment issue, "the federal requirements need to be followed, which means [the State needs] to show affirmatively that [its] evidence is not going to be derived from" the immunized testimony. The trial court further opined, "So the question before me is, if this gentleman testifies to the effect that his reports and his investigation [were] complete at the time he made a presentation to the grand jury, and review of the grand jury testimony of these two gentlemen indicates that there's nothing that would advance the investigation, then I think they've met their burden."

Lieutenant Rubio testified that in October 2014, he received a referral from the Comal County Sheriff's Office regarding misappropriation of funds by Walker and Bloxham. Rubio investigated the case for two years. He testified that the investigation ended between March and June 2016. Rubio testified that he had all the information about the case before an indictment was presented and that the information included "quite a bit of subpoenas . . . [and] quite a few interviews with school district employees." He testified that the interviews were completed prior to the indictment. Rubio stated that he was aware there was immunized testimony from Walker and Bloxham but that it was not used in his report. When asked how he knew for sure that the immunized testimony was not used, Rubio replied that the report was "pretty much done" by the time the men were called to the grand jury.

The State asked Rubio to describe what instances of Bloxham's alleged criminal conduct he was aware of prior to Bloxham's grand jury testimony. Rubio stated that his investigation uncovered that a metal building had been removed from one of the high schools and relocated to Bloxham's house. He also knew that some concrete at Bloxham's house was partially paid for by Bloxham and partially paid for by the school district. A search warrant found several HVAC units at Bloxham's residence that had been purchased by the school district, which Rubio could identify by their serial numbers.

Rubio testified that he reviewed the indictments and that no immunized testimony from Bloxham or Walker was used. He stated that the information in the indictments came from subpoenaed information that was obtained before the grand jury heard the case.

On cross-examination, Rubio testified that after Bloxham's testimony, he sought forensic analysis of computers provided by the school district. He testified that this research was not complete before the grand jury testimony and continued after Bloxham's immunized testimony. He testified that though there were other offenses presented to the grand jury, at the conclusion of his report, he had evidence related only to three crimes: theft by a public servant, abuse of official capacity, and misapplication of fiduciary property. Rubio testified that in preparation for the *Kastigar* hearing, ADA Palmitier, the assistant district attorney representing the State in the hearing, had given him Bloxham's immunized testimony to review and consulted with him about it. Rubio testified that they talked about whether information was gathered before or after the immunized testimony.

The State reviewed the facts alleged in the indictment, paragraph by paragraph, and asked Rubio if the subpoenas and interviews obtained prior to the grand jury provided the information for the indictment. He answered affirmatively to each paragraph.

On further cross-examination, Rubio admitted that he continued investigating after the last date listed on his report by seeking out witnesses to interview. Rubio conceded that his report contained no evidence that Bloxham knew that the concrete work performed at his house had been billed to the school district.

The State then called ADA A. Buess. She testified that she started working for the district attorney's office on October 1, 2017. She began working on Bloxham's case in May 2018. She testified that ADA Palmitier asked her to present a file to the grand jury, and he briefly filled her in on the history of the case. She stated she was told that to ensure that the immunized testimony did not play a role in the indictment, the office wanted a "fresh prosecutor" who did not have any knowledge of the case to review and present it to the grand jury. She stated that she did not review any immunized grand jury testimony.

ADA Buess stated that the indictment for a new grand jury was prepared at her direction by a grand jury clerk, shortly before May 9, 2018. She presented it to the grand jury, and it was true billed. She was the only prosecutor with the grand jury for the presentation. She did no further investigation to seek the indictment. She used the report prepared by the Attorney General's office, with its last supplement written March 29, 2016.

14

On cross-examination, ADA Buess further explained that ADA Palmitier had told her the case involved an investigation into high-level Comal County ISD employees who had possibly stolen construction items or items related to remodeling school property. ADA Buess said that the office's grand jury clerk prepared the indictment based on ADA Buess's charging decisions, and ADA Buess gave the clerk her case file. The same grand jury clerk had prepared the first indictment against Bloxham.

At the conclusion of the hearing, the court ruled: "I'm not going to allow the State to use any evidence that was produced subsequently to the first grand jury presentation." The trial court declined to state specifically what evidence was excluded by this ruling. The trial court told Bloxham to object during trial if he believed that evidence presented was in violation of the ruling. The court stated, "Now there may be some evidence that [the State] already had awareness of or whatever else that came up after that, but as far as developing anything from those testimonies that [Bloxham and Walker] gave at the first grand jury, then anything that [the State has] developed from that testimony would not be allowed. But again, I'm not going to itemize what it is."

## C.    Analysis

The trial court erred by denying Bloxham's motion to dismiss the indictment because the State did not meet its "heavy burden" under *Kastigar* to establish that

15

the evidence it planned to use against Bloxham proceeded from legitimate, independent sources. *See Kastigar*, 406 U.S. at 461–62. The record demonstrates that the State did not meet its burden to show that Bloxham's prosecution proceeded from independent sources and was not tainted by his immunized testimony.

No Texas case provides guidance as to how the State best could prove that the evidence it used to prosecute Bloxham did not derive from his immunized testimony. Nor does case law suggest an appropriate format for the *Kastigar* hearing. The New Jersey district court in *U.S. v. Smith* considered four possible methods for conducting a *Kastigar* hearing: (1) the government could prove that a wall shielding the prosecutor from the information has held firm; (2) stipulation by the investigator and prosecutor that the information did not impact their prosecution; (3) demonstration by the government of proof of prior knowledge of the information; or (4) a full evidentiary hearing in which the government presents each piece of evidence to be presented at trial to show that it derived from sources independent of the immunized testimony and that the government did not use the testimony in any respect. *United States v. Smith*, 580 F. Supp. 1418, 1422–24 (D.N.J. 1984). The *Smith* court determined that only the last method was sufficient to meet the *Kastigar* burden. *Id.* at 1424. On appeal, Bloxham offers two additional potential methods where the State could meet its burden under *Kastigar*: canning

16

testimony and total non-exposure. "Canning testimony" means that a court can compare a witness's expected testimony with their "canned" statements, statements made before the immunized witness gave his immunized testimony. *United States v. Poindexter*, 951 F.2d 369, 372 (D.C. Cir. 1991).

We need not decide which of these methods is appropriate because the State failed to meet its burden on all accounts. First, though the trial court held an evidentiary hearing, the court did not review the evidence to be presented at trial. The State presented only two witnesses and did not present any evidence that it intended to introduce at trial. The State chose not to call any of the 13 witnesses it ultimately called at trial, aside from Lieutenant Rubio, nor did it discuss the 110 exhibits it offered at trial to prove independent sources for each. Without this information, the trial court could not determine if the State affirmatively proved that the evidence it proposed to use at trial against Bloxham derived from legitimate sources wholly independent of his compelled testimony. *Kastigar*, 406 U.S. at 460 (describing State's burden once defendant establishes that he testified pursuant to immunity).

At the conclusion of the hearing, the trial court excluded testimony gathered after Bloxham's immunized testimony, but the court did not specify what this evidence was. The trial court erroneously shifted the burden to Bloxham, concluding that Bloxham needed to object during trial if he thought that the State

17

was presenting evidence derived from his immunized testimony. After Bloxham established that he testified pursuant to use immunity yet was indicted after, the burden was on the State to prove that it proceeded free of the taint of that immunized testimony. *Kastigar*, 406 U.S. at 460.

Having concluded that the trial court did not hold a full evidentiary hearing in which it evaluated every piece of evidence to decide whether it was tainted by Bloxham's immunized testimony, we proceed to review other options for proving the State's burden in a *Kastigar* hearing and whether the State met that burden. Bloxham suggests that the State could "can" witness statements, but the State made no effort to do so. The court did not compare the trial witnesses' expected testimony with their "canned" statements, taken before Bloxham gave his immunized testimony, and then rule on whether the witnesses could testify at trial. *Poindexter*, 951 F.2d at 372.

Second, the record reflects that though it argued that it had, the State did not create a "wall" between the prosecuting attorney and the rest of the district attorney's office, or between the prosecuting attorney and access to the compelled testimony. We note that several courts have rejected this idea, reasoning that even if a prosecutor has never seen the witness's testimony and may believe in good faith that no one associated with the prosecution has seen it, such a disclaimer does not preclude the possibility that someone who has seen the compelled testimony

18

was thereby led to evidence that was furnished to the prosecution. *United State v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977); *see also Kastigar*, 406 U.S. at 469 (Marshall, J., dissenting) ("For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of this investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony.").

Even if a "wall" could be effective, the State did not erect one in Bloxham's case. The record reflects that ADA Buess testified at the *Kastigar* hearing that ADA Palmitier informed her of the nature of the case when he assigned it to her. ADA Buess testified that she gave the case file to a grand jury clerk in the prosecuting office who prepared the second indictment at her direction. The grand jury clerk was not "walled" off from the immunized testimony because that same clerk also prepared the 2016 indictment. ADA Buess testified that the grand jury clerk received the entire case file to prepare the indictment. Moreover, Lieutenant Rubio testified that he assisted in the grand jury proceedings, providing questions to the prosecution. Though he at first testified that his investigation was complete before the grand jury convened, he also testified that he continued to investigate after the immunized testimony, including running search terms on Bloxham's and Walker's computers and supplementing his written report. He also met with a

19

witness. Finally, the State gave him Bloxham's immunized testimony and discussed it with him prior to the *Kastigar* hearing. Lieutenant Rubio later testified at trial, despite his exposure to the immunized testimony. The State did not separate those in its office who had been exposed to the immunized testimony. Even if the State could have demonstrated such an effort to do so, *Kastigar* warns that a defendant should "not [be] dependent for the preservation of his rights on the integrity and good faith of the prosecuting attorneys." *Kastigar*, 406 U.S. at 460.

The record also does not reflect that the State could meet its burden by claiming that it had prior knowledge of all the evidence before Bloxham testified before the grand jury. Rubio testified that the evidence came from his report to the Attorney General, which the State had prior to the grand jury. Rubio also testified, however, that he continued to investigate after he was exposed to the immunized testimony. He was present in the grand jury room, assisting with questions for witnesses, and he was present for Walker's immunized testimony. He interviewed a trial witness weeks after Bloxham's immunized testimony was compelled. He also continued his investigation after the last date of his investigative report, and after Bloxham's immunized testimony. After Bloxham testified, Lieutenant Rubio ran search terms on Bloxham's and Walker's computers.

Lieutenant Rubio was aware of Bloxham's immunized testimony, though he was not present when Bloxham testified. The State gave him the testimony to

review in anticipation of the *Kastigar* hearing. The court did not review Lieutenant Rubio's anticipated trial testimony. *See Kastigar*, 406 U.S. at 457 (explaining full-use immunity includes direct or indirect use).

Lieutenant Rubio also testified that before Bloxham's testimony, he had evidence of only the following crimes: abuse of official capacity, theft, and misapplication of fiduciary property. Yet the State indicted Bloxham for additional crimes, including bribery. The evidence cannot support a stipulation by Rubio or the State that they conducted their investigation independent of the immunized testimony, possessed all the evidence prior to the immunized testimony, or made no use of it in pretrial preparations.

On these facts, we cannot conclude that Bloxham and the State were in "substantially the same position" as if Bloxham had not been compelled to testify. *See Kastigar*, 406 U.S. at 458–59 (holding that testimony compelled from witness under immunity must leave him and government in "substantially the same position as if the witness had claimed his privilege" to remain silent in absence of immunity). Use immunity includes direct and indirect or derivative use of the defendant's immunized testimony. *Id.* at 457; *Dansby*, 448 S.W.3d at 453 n.7. Prior knowledge of the case against the defendant does not preclude the government from using the immunized testimony in subtle ways, such as in plea

bargaining, interpreting evidence, or planning cross examination. *United States v. Semkiw*, 712 F.2d 891, 895 (3rd Cir. 1983).

The State argued that it had knowledge of all the evidence before Bloxham's immunized testimony because all of it was contained in Rubio's report, which it argued was complete before the grand jury proceedings. Rubio's testimony contradicts this argument. Rubio testified that he continued to investigate after Bloxham testified and that he supplemented his report. Rubio testified that his report only had evidence for three crimes, when Bloxham was initially charged with more crimes. The evidence from the *Kastigar* hearing does not reflect that the State's trial evidence was completely procured before Bloxham testified. It cannot be said that Bloxham and the State were in "substantially the same position" as if he had claimed the Fifth Amendment privilege and not testified. *Kastigar*, 406 U.S. at 458–59.

Finally, we note that Bloxham's and Walker's grand jury testimony is not in the record. The parties had access to it at the *Kastigar* hearing, and the trial court stated that it had read the testimony. In his reply brief, Bloxham argues that access to the transcripts could prove additional instances of the State's use of his immunized testimony. Having concluded on the record before us that the State did not meet its burden to show that it did not use Bloxham's immunized testimony,

22

we see no need to invade the sanctity of grand jury proceedings by reviewing the testimony at this time.

We are sympathetic to the trial court, who was given the task of conducting a *Kastigar* hearing with only vague guidance as to how to do so. Once the State compelled Bloxham to testify and then indicted him, the State assumed the heavy burden of demonstrating that it did not use Bloxham's immunized testimony in any way in the prosecution. "Grants of immunity from prosecution are conceptually promises to dismiss a case." *Hatter*, 655 S.W.3d at 593. The State here did the opposite.

Reviewing the record, we hold that the State's evidence was insufficient to demonstrate that the State had legitimate sources for all its evidence, wholly independent of Bloxham's immunized testimony. The State also did not show that that its witnesses had not used, directly or indirectly, Bloxham's immunized testimony against him. The trial court erred by not dismissing the indictment against Bloxham following the *Kastigar* hearing.

We likewise agree with Bloxham that this error was fundamental, constitutional error. Tᴇx. R. Aᴘᴘ. P. 44.2(a). We must reverse a judgment of conviction unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. The State's failure to prove that its evidence derived from wholly independent sources from Bloxham's compelled

23

testimony in forfeiture of his Fifth Amendment right is constitutional error. We cannot say beyond a reasonable doubt that the error did not contribute to his conviction. TEX. R. APP. P. 44.2(a). We sustain Bloxham's first issue and reverse and render judgment dismissing the indictment.

## Conclusion

Given our holding, we need not address Bloxham's remaining issues. We reverse the judgment of conviction, dismiss the indictment, and render a judgment of acquittal.


Peter Kelly
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Publish.  TEX. R. APP. P. 47.2(b).

24